**ABRAM & TRACY, INC., Appellant,**

v.

**SMITH et al., Appellees.**

[Cite *Abram & Tracy, Inc. v. Smith* (1993), 88 Ohio App.3d 253.]

Court of Appeals of Ohio,
Franklin County.

No. 92AP–1503.

Decided June 15, 1993.

254

*David A. Bressman,* for appellant.

*Vorys, Sater, Seymour & Pease* and *Richard D. Schuster,* for appellees.

---

PEGGY BRYANT, Presiding Judge.

Plaintiff-appellant, Abram & Tracy, Inc., appeals from a judgment of the Franklin County Court of Common Pleas finding in favor of defendants, Douglas Smith and Micromart, Inc. ("Micromart"), on plaintiff's negligence and breach of contract claims.

Plaintiff is a small business engaged primarily in plumbing maintenance and repair. To satisfy its record-keeping needs and to streamline operations, plaintiff entered into a contract with Micromart on May 22, 1987 for the purchase of a Sperry computer, a printer, and bookkeeping and accounting software. In addition to accounting capabilities, the software was capable of storing written histories of plumbing jobs plaintiff performed for its business accounts. Under the contract, Micromart also provided software training and entered certain business accounts into the new computer system. In June 1987, the system was delivered and installed at plaintiff's place of business.

From June 1987 to October 11, 1990, plaintiff's computer system functioned well and plaintiff had few complaints. Sometime prior to October 11, 1990, Smith contacted Tom Abram, president of plaintiff, and asked Abram for permission to use plaintiff's computer system to do some work for Converse Electric, another Micromart client. Abram agreed and made arrangements for Smith to use the computer.

On October 11, 1990, Smith commenced working on his assignment for Converse Electric. Smith's work required that he have access to the computer's hard disk drive containing plaintiff's accounting and job history data files, and that he remove the files from the disk drive. Before removing the data files, however, Smith made two backup copies of the files on a tape backup system built into the computer. The backup system consisted of a tape drive and removable data tapes designed to store information contained on the computer's hard disk drive in the event the hard disk drive should fail. As Smith made both backup tapes, the computer verified the accuracy of the data on each of the tapes by running two separate verification tests, a verbose method test and cyclical redundancy test. As it ran each of these tests, the computer displayed visual messages on the computer screen to indicate if any errors were encountered during the backup process. The computer indicated no errors during the backup process on October 11, 1990.

Smith then removed all of plaintiff's files from the computer's hard disk drive and performed his work for Converse Electric. After completing that work, Smith tried to retrieve plaintiff's files from the backup tapes to the hard disk. Unfortunately, the tape drive was unable to read either of the backup tapes. After informing an employee of plaintiff of the problem, Smith sought the assistance of Bruce Rubin, a computer hardware specialist.

Rubin examined the computer and found that the inside of the computer was dirty and that dust had gotten inside the computer's backup tape unit. Rubin testified that iron particles in dust and dirt can affect magnetic components, such as a computer tape drive, and that the dusty conditions inside the computer may have been responsible for the tape drive's failure to read the backup tapes.

On Monday, October 15, 1990, Smith informed Abram of the problems with the tape drive and attempted to restore plaintiff's computer system. Over the next few days, Smith placed the software programs that plaintiff had been using back on the computer and customized the software so that it functioned essentially as it had prior to October 11, 1990. Besides the software programs, much of the data that existed on plaintiff's system prior to October 11 were job history files for customer accounts. Because the tape drive could not retrieve data from the backup tapes, Smith was unable at that time to restore the job history files to the computer system. Instead, from mid-October 1990 to mid-December 1990, Smith periodically typed the job history information of a few of plaintiff's most vital rental accounts into the computer. On December 16, 1990, Smith went on a two-week break for the holidays. After trying unsuccessfully to reach Smith during that vacation period, plaintiff filed the present suit on January 4, 1991.

In April 1991, Smith got the backup tapes from plaintiff and made arrangements to attempt to retrieve the data from the tapes. In September 1991, Smith was eventually able to recover the job history files from the backup tapes with a Motorola computer system, and with the assistance of Motorola engineers in Chicago; the data was later transferred onto computer diskettes and loaded back onto to plaintiff's computer.

Thereafter, Abram asked Smith to demonstrate that all the prior data had been restored by calling up certain sample invoices Abram claimed existed on the computer system prior to October 11, 1990. Smith was unable to recall any of the invoices.

In November 1991, plaintiff bought a new computer for its operations with greater storage capacity and capabilities. Presently, plaintiff principally uses its new computer but periodically uses its old computer to call up old job histories.

The trial court dismissed plaintiff's breach of contract claim against Smith prior to trial, conducted a nonjury trial and found for Micromart on plaintiff's

breach of contract claim, for both defendants on plaintiff's negligence claims and for defendants on their counterclaim for the unpaid balance due on the contract. Plaintiff appeals therefrom, assigning the following four errors:

"Assignment of Error I

"The lower court's judgment in favor of defendants on plaintiff's breach of contract claims is in direct contradiction to the manifest weight of the evidence presented at trial.

"Assignment of Error II

"The lower court committed substantial error in finding in favor of defendants on plaintiff's negligence claim when the manifest weight of the evidence established defendants' negligence.

"Assignment of Error III

"The manifest weight of the evidence established that plaintiff had suffered serious and extensive damages as a result of defendants' breaches of contract and negligence. Therefore the lower court committed material erred [*sic*] in findings of fact # 24 and # 25 as well as conclusions of law # 5, # 10, # 11, and # 12.

"Assignment of Error IV

"The court erred in finding on behalf of defendants on their counterclaim when such was not properly presented in defendants' pleadings."

In its first, second and third assignments of error, plaintiff contends that the trial court's judgment was against the manifest weight of the evidence. When presented with such an argument, an appellate court will not overturn the trial court's verdict if there is "some competent, credible evidence going to all the essential elements of the case." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. Adjudging the credibility of the witnesses and weighing the value of their testimony are tasks best left to the trier of fact. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273.

In its first assignment of error, plaintiff argues the trial court erred in ruling against it on its breach of contract claim. Plaintiff contends Micromart breached its contract because it failed to fulfill its hardware service obligations, failed to provide operating manuals for the computer hardware, and failed to test adequately the computer equipment during installation.

Initially, plaintiff argues Micromart failed to provide proper maintenance on the computer hardware and failed to inform plaintiff of the need for maintenance. At issue is the interpretation of the word "service" as used in the written

contract between the parties.[1]  Plaintiff contends that we should interpret the contract as a general service contract and that the word "service" should be interpreted to include hardware maintenance.  Micromart argues that the contract does not contemplate hardware maintenance and that it did not breach its contractual obligations.  The trial court below found that the contract did not contain any specific service clause for hardware maintenance and that Micromart never agreed to provide such maintenance services.

In a commercial transaction, generally, the meaning of the parties' written agreement should be determined by the language the parties use, but the parties' actions, read and interpreted in light of their previous dealings and usage of trade, may also assist in ascertaining the meaning of their agreement in some instances.  *Karat Gold Imports, Inc. v. United Parcel Serv., Inc.* (1989), 62 Ohio App.3d 604, 610, 577 N.E.2d 115, 119;  Official Comment to R.C. 1301.11 (UCC 1–205).

Generally, a writing should be interpreted as a whole and all the writings that are part of the same transaction should be interpreted together.  Restatement of the Law 2d, Contracts (1981) 86, Section 202(1) and (2); 2 Farnsworth, Contracts (1990) 255–256, Section 7.10.  Looking at the contract in the present case as a whole, we note the term "service" is used only once, and in an introductory paragraph.  In the second paragraph, which specifically delineates the "hardware, software, and service" referenced in the first paragraph, no mention is made of service or maintenance, aside from that implied by the warranty provision.  Further, the testimony at trial from all the witnesses indicates, and the plaintiff admits in its brief, that the parties never discussed hardware service or maintenance prior to contracting.  Given all of the foregoing,

---

1.  The contract provides, in relevant part:
     "Dear Gentlemen,
     "This proposal is our recommendation for the best computer system for your business needs, that we are aware of in the computer market today.  Please review the following quotation as our suggestion for your hardware, software, and *service* requirements:
     "HARDWARE:
     "1.  Unisys/Sperry model IT with 1mb RAM, 44mg 28ms hard drive, monochrome or amber monitor, pro-style keyboard, & 60mg tape backup.
     "2.  Two Wyse 50 data terminals with cables.
     "3.  Toshiba P351 printer with 100cps letter quality print, 288cps draft mode print, & tractor & 6' cable.
     "4.  Uninterruptible power supply with 10 minutes of power to allow safe shutdown & excellent surge protection.
     "5.  One year warranty for all hardware.
     "SOFTWARE:
     "* * *
     "4.  Complete installation & training."  (Emphasis added.)

some competent, credible evidence supports the trial court's finding that the contract did not contain any specific service requirement.

Alternatively, plaintiff argues that the course of performance between the parties established that Micromart had a duty to perform hardware maintenance on plaintiff's computer, and that customary usage of the term "service" required Micromart to inform plaintiff of the need for preventive maintenance.

■■■■ A course of performance between two parties pursuant to a contract for the sale of goods may be relevant to determine the meaning of provisions in a sales contract. R.C. 1302.11(A) (UCC 2–208[1]); White & Summers, Uniform Commercial Code (1988) 62–64, Section 1–6; Farnsworth, *supra*, at 292–293, Section 7.13. In the present case, plaintiff argues that because Micromart, through Smith, occasionally fixed problems with its computer, Micromart assumed a continuing duty under the contract to perform hardware "service." Some evidence presented at trial indicated plaintiff's computer would occasionally "lock up" because certain data files would become too large for their file parameters on the hard disk. When this type of problem occurred, Smith would fix the problem by entering a few keyboard commands that expanded the file parameters enough to allow the computer to function normally. Plaintiff presented no testimony, however, establishing that such actions constituted hardware maintenance. Moreover, the evidence also indicated Micromart always rendered these services in response to specific requests made by plaintiff and was compensated separately for the services. The fact that Micromart was paid for such services separately could reasonably be construed by the trial court as evidence that these services were performed as independent service calls, rather than as some contractual service obligation. Plaintiff further argues that the word "service" itself is a usage of trade in the computer industry and that its use in the contract herein required Micromart to inform plaintiff of the need for maintenance.

■■■■ Usage of trade may be used to help interpret contractual provisions. R.C. 1301.11(B) (U.C.C. 1–205[2]). The existence and scope of such a usage of trade are proved as matters of fact. *Id.* A practice or method of dealing qualifies as usage of trade if it has "such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question." *Id.*

The testimony at trial regarding whether the practices in the computer industry required Micromart to notify plaintiff about the need for a hardware maintenance contract was conflicting. Plaintiff's expert, Louis Menduni, testified that, as a computer vendor, although he would not recommend a hardware service contract for a business the size of plaintiff, he would mention the

possibility of a service contract to a computer buyer. In contrast to Menduni's testimony, Smith stated it was customary in the industry for the computer manufacturers, rather than computer vendors, to recommend hardware service contracts. Defense expert, Thomas Ryan, also testified that, at the time the computer in the present case was sold, computer manufacturers customarily assumed hardware maintenance duties. Smith explained hardware service was normally suggested by the manufacturer when it received the computer's registration card from the consumer. In the present case, the registration card for plaintiff's computer was located at the back of the computer's operating manual.

On a related matter, plaintiff also contends Micromart breached the contract by failing to provide operating manuals for the computer that would have informed plaintiff of its potential service options. The evidence presented at trial was conflicting, with Smith testifying that he saw the operating manuals for the Sperry computer at plaintiff's office, and plaintiff's employees denying receipt of any such manuals.

The trial court below heard the testimonial evidence relating to the usage of trade and whether Micromart provided operating manuals. Judging the credibility of witnesses and weighing the value of their testimony are tasks generally left to the trier of fact. See *Seasons Coal Co., supra.* Micromart presented evidence which, if believed by the finder of fact, provides competent, credible evidence supporting the trial court's verdict.

Finally, plaintiff contends the backup tape drive on its computer never had the ability to restore data because the computer was not properly tested and installed. The evidence at trial indicated, however, that it was Micromart's usual business practice to test the computers it installed, and that prior to October 11, 1990, plaintiff's computer experienced no problems in backing up data on its tape drive. Based on this evidence, we cannot say the trial court erred in ruling against plaintiff on its breach of contract claims.

For the foregoing reasons, plaintiff's first assignment of error is overruled.

In its second assignment of error, plaintiff asserts that the trial court erred in denying its negligence claim.[2] To maintain an action in negligence, plaintiff must show defendants owed plaintiff a duty of care and breached that duty, which proximately caused injury to plaintiff. *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265, 270; *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 21 O.O.3d 177, 423 N.E.2d 467; *Gedeon v. E. Ohio Gas Co.* (1934), 128 Ohio St. 335, 190 N.E. 924. In its brief, plaintiff argues that several of the

---

2. Plaintiff did not allege a bailment cause of action in its complaint, nor did it argue bailment in the trial court. The trial court did not address the issue of bailment, which also has not been raised on appeal.

trial court's factual findings regarding defendants' alleged negligence were erroneous. Plaintiff's contentions generally center around the issue of whether defendants breached a duty of care to plaintiff.

The evidence presented at trial indicates that, on October 11, 1990, after obtaining permission to use the computer, Smith made two backup tapes of the data contained in plaintiff's files. The computer ran two verification tests which did not indicate the computer had any problems in backing up the data. Smith then removed the files from the hard disk without first checking to see whether the tape drive was capable of retrieving data from the backup tapes. Plaintiff asserts that Smith breached his duty of care by not trying to retrieve data from the tape drive prior to removing plaintiff's files in order to ensure that the unit was functioning properly.

The common-law duty of care generally requires that a person exercise that degree of care which an ordinarily reasonable and prudent person exercises, or is so accustomed to exercising under the same or similar circumstances. *Mussivand, supra,* 45 Ohio St.3d at 318, 544 N.E.2d at 270; *Gedeon, supra,* 128 Ohio St. at 338, 190 N.E. at 925. Application of this standard of care to particular circumstances appropriately includes examining industry custom and practices. Evidence of industry custom does not conclusively establish the legal standard of care in a particular case, but may be considered by a court as evidence to determine whether the defendant exercised ordinary care under the circumstances. See *Thropp v. Bache Halsey Steward Shields, Inc.* (C.A.6, 1981), 650 F.2d 817; *Thompson v. Ohio Fuel Gas Co.* (1967), 9 Ohio St.2d 116, 38 O.O.2d 294, 224 N.E.2d 131.

In the present case, both parties presented testimony on whether Smith's actions comported with the standard of care customarily exercised in the computer industry. Plaintiff's expert, Louis Menduni, testified that defendants' actions in making two backup tapes were prudent and stated that the only other precaution defendants should have taken was to try to retrieve data from the tapes in order to verify that the backup tapes had been made properly. Smith noted, however, that the computer's backup system contained built-in verification procedures which indicated that the backup tapes were made properly in the present case.

More significantly, Smith and defense expert, Thomas Ryan, each testified that, if Smith had attempted to retrieve data from the tapes, as Menduni suggested, such actions would have overwritten existing files on the hard drive

and would have risked data loss.[3] Thus, Smith had no easy way of retrieving data from the backup tapes without disturbing existing files on the hard drive. Ryan testified that Smith could have retrieved data from the backup tapes to the hard disk and avoided disrupting existing files if Smith had gone through a more complicated process in which he established a separate directory on the hard disk and then retrieved data into that separate directory. Plaintiff's evidence did not establish, however, that customary care required such additional precautions when using plaintiff's type of computer system. Indeed, Ryan stated that, on a computer like the one used by plaintiff, retrieving files from backup tapes to the hard drive is not proper procedure under normal circumstances.

The line of testimony presented by Ryan and Smith, if believed, represents some competent, credible evidence supporting the trial court's finding that Smith exercised the degree of care which a careful, prudent person would exercise when using this type of computer. Accordingly, plaintiff's second assignment of error is overruled.

In its fourth assignment of error, plaintiff argues that the trial court erred in finding for defendants on their counterclaim. In response to plaintiff's original complaint, defendants filed an answer and a counterclaim in one document for the amount unpaid on the original computer contract. Plaintiff subsequently filed an amended complaint to which defendants responded with an amended answer. Defendants' amended answer did not, however, restate their original counter-claim. Plaintiff argues that, because an amended pleading generally supersedes the original, defendants' failure to restate the counterclaim effectuated dismissal of that counterclaim.

Plaintiff provides no authority which specifically states that failure to replead a counterclaim under these circumstances effectuates a dismissal. Although an amended pleading supersedes the original pleading, *Levy v. Univ. of Cincinnati* (Nov. 4, 1987), Hamilton App. No. C–860780, unreported, 1987 WL 14677, an answer and a counterclaim are separate pleadings, even if combined in one document. Thus, defendants' amended answer supersedes only the original answer, not their counterclaim. Amendment of defendants' original answer did

---

**3.** Ryan and Smith testified that while Menduni's recommended precautions were appropriate for a computer using a Microsoft DOS operating system, they were not recommended for a computer using a XENIX operating system. The discrepancy in recommended precautions may be traceable to Menduni's lack of familiarity with the operating system on plaintiff's computer. Menduni admitted on cross-examination that he possessed only a limited knowledge of the XENIX operating system and was more familiar with computers using the Microsoft DOS operating system. Plaintiff's computer uses the XENIX operating system. A computer using the XENIX operating system, according to Ryan, stores data differently than computers using Microsoft DOS and erases other data whenever a file is restored unless special precautions are taken.

not require a refiling of the counterclaim, which was not amended. Civ.R. 15 governs the amendments of pleadings such as those involved in the case herein. Civ.R. 15's provisions are generally interpreted liberally to effectuate justice and to avoid the dismissal of claims on unnecessarily technical grounds. McCormac, Ohio Civil Rules Practice (1992) 218, Section 902. In the absence of authority compelling us to dismiss defendants' counterclaim, we do not read Civ.R. 15 in a manner which would dismiss a potentially meritorious claim on such a technical basis.

Accordingly, plaintiff's fourth assignment of error is overruled.

In its third assignment of error, plaintiff argues that the trial court erred in rejecting its claim for damages caused by defendants' breach of the contract and defendants' negligence. Because we held that the trial court's judgment finding that defendants did not breach their contractual obligations or act negligently is supported by the evidence, plaintiff's third assignment of error is moot, and is accordingly overruled.

Having overruled all of plaintiff's assignments of error, we affirm the judgment of the trial court.

*Judgment affirmed.*

TYACK and CLOSE, JJ., concur.