CONFER PLASTICS, INC., Plaintiff,

v.

HUNKAR LABORATORIES
INC., Defendant.

No. 95–CV–326H.

United States District Court,
W.D. New York.

April 7, 1997.

Alan R. Feuerstein, Buffalo, NY, for Plaintiff.

Gerald J. Whalen, Williams, Stevens, McCarville & Frizzell, P.C., Buffalo, NY, for Defendant.

## DECISION AND ORDER

HECKMAN, United States Magistrate Judge.

The parties have consented to the undersigned conduct any and all further proceedings in this case, including the entry of final judgment, in accordance with 28 U.S.C. § 636(c). Pending for decision is defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Item 7). For the following reasons, defendant's motion is granted in part and denied in part.

## *BACKGROUND*

Plaintiff is a corporation engaged in plastic extrusion manufacturing with its principal place of business located in North Tonawanda, New York. Defendant designs, manufactures, and supplies industrial controls, computer systems, and monitoring devices, Its principal place of business is located in Cincinnati, Ohio.

On June 10, 1992, defendant submitted a quotation (number 10781) proposing to sell to plaintiff a computer integrated manufacturing "starter" system (CIM–1, Version II) for $47,588.00, plus costs and expenses of training and service (Item 7, Ex. A). The quotation was sent under a cover letter that stated, in part:

As per the request of our area manager, Mr. Pete DeBisschop, we are pleased to submit our quotation # 10781. The CIM–1 Integrated Manufacturing System has been proven in over 70 factories in the plastics industry. CIM–1 is the result of more than 30 years of Hunkar plastics industry experience, and it is on the leading edge of proven technology.

The complete system can allow you to implement SPC, SQC and plant-wide communications for optimum manufacturing management. Regardless of your initial starting point, the modular expansion capability facilitates evolving your system to virtually every process in the plant.

We have based this proposal on your conversations with Pete and our sales representative, Bruce Buchman, and we are confident that this configuration offers you significant profit improvement potential in the next 12 months.

(Item 9, Ex. 1). A document setting forth defendant's terms and conditions, titled "Standard Conditions of Sale–Warranty," (Standard Conditions) was also included with the quotation. The conditions included the following warranty limitations:

LIMITATIONS

THE WARRANTIES HEREIN ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE OF ANY EQUIPMENT, PRODUCT, OR CONTROL SYSTEM (WHETHER HARDWARE OR SOFTWARE) MANUFACTURED, DESIGNED OR SOLD, BY HUNKAR LABORATORIES INC. HUNKAR LABORATORIES INC. SHALL NOT BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING FROM THE USE, SALE, OR OPERATION OF ANY EQUIPMENT, PRODUCT, OR CONTROL SYSTEM (WHETHER HARDWARE OR SOFTWARE) MANUFACTURED, DESIGNED OR SOLD BY HUNKAR LABORATORIES INC. THE REMEDIES OF OUR CUSTOMERS SET FORTH HEREIN ARE EXCLUSIVE. . . .

(Item 7, Ex. B). On July 22, 1992, plaintiff issued a purchase order (number 31713) for the CIM–1, Version II system offered by defendant (Item 7, Ex. C).

On September 30, 1992, at plaintiffs request, defendant submitted another quotation (number 10866) for equipment supplemental to the CIM system already ordered (Item 7, Ex. D). The revised quotation included a change in the central computer from an IBM PS Model 30/286 to an IBM industrial grade computer. It also added six DAT–Il machine monitor terminals to the three originally purchased. Defendant quoted a total system price of $109,520.00, less a credit of $47,588.00 for plaintiff's existing purchase order number 31713, for a net additional charge of $61,932.00. Defendant's Standard Conditions were included with this quotation as well. On October 9, 1992, plaintiff issued a purchase order (number 31713A) for the supplemental equipment (Item 7, Ex. E).

On October 29, 1992, defendant acknowledged plaintiffs purchase orders as an acceptance of the terms set forth in defendant's quotation of September 30, 1992 (Item 7, Ex. E). All components were to be shipped to plaintiff by April 1, 1993 (Item 7, Ex. D). Plaintiff was to pay defendant a total of $109,520.00 plus shipping. To date, plaintiff has paid $94,068.38.

Defendant claims it shipped all of the equipment described in its quotations in October 1992 (Item 7, p. 5).[1] Plaintiff asserts that the system was delivered on or about April 4, 1993 (Item 9, p. 2).[2]

---

1. This statement contradicts defendant's cover letter of September 30, 1992, which states that the industrial computer and three DAT units would be shipped in the initial phase of plaintiff's program, with the balance of the order released for shipment within the next six months (item 9, Ex. 2).

2. In its concluding remarks, plaintiff states that defendant shipped all goods in October 1992 (Item 9, p. 8). In a letter to defendant dated April 14, 1993, plaintiff indicated that the CIM system were received in phases (Item 9, Ex. 5). An internal memorandum dated August 31, 1 993 states that system components were installed in January, March, April, and May of 1993 (Item 9,

The record indicates that plaintiff first contacted defendant regarding its dissatisfaction with the CIM system in April 1993.[3] In a letter dated April 14, plaintiff informed defendant of specific problems with the system including the manner in which the new DAT terminals handled reporting with respect to rejected parts, the limited time period that production data could be stored on the main computer, the fact that the DATs were set to automatically reject parts, and the lack of provisions for family molds (Item 9, Ex. 5).[4] On that same date, defendant offered to upgrade plaintiff's system from a CIM–I to a CIM–III at no charge.

An internal memorandum, dated August 27, 1993, indicates that plaintiff continued to experience problems importing data and generating reports after the CIM–III upgrade was installed. Plaintiff characterized defendant as "very responsive" and "genuinely interested in helping resolve our problems," but noted little progress toward resolution at that time (Item 9, Ex. 7). On August 31, 1993, plaintiff wrote to defendant detailing the problems it was currently experiencing (Item 9, Ex. 8).[5]

Defendant expressed its intent to resolve the stated problems and responded to seven of plaintiffs eight concerns on October 1, 1993 (Item 9, Exs. 11 & 12). Plaintiff was asked to supply data files to assist in resolving the remaining problem (Item 9, Ex. 12).

On October 27, 1993, plaintiff acknowledged resolution of "the numerous problems that were plaguing our CIM system installation," and stated that it would forward the files defendant had requested relating to plaintiffs inability to generate customer history reports. In addition, plaintiff requested a quotation on hardware and software to install a satellite CIM terminal (Item 9, Ex. 14).

On March 3, 1994, plaintiff sent defendant a check for one-half of the then outstanding balance, acknowledging that most of the outstanding problems had been resolved (Item 9, Ex. 15). Plaintiff expressed its intent to pay the balance after monitoring the system for the following two to four weeks for overall functioning and accuracy of reports generated (*Id.*).[6] Plaintiff again mentioned its need to order additional components to expand the system (*Id.*).

On February 9, 1995, plaintiff wrote to defendant expressing dissatisfaction with defendant's parts replacement services, maintenance services, and technical support (Item 9, Ex. 16). Plaintiff stated that the system had been a costly mistake and expressed a desire to disassemble it and return it to defendant for the purchase price paid to date (*Id.*). While plaintiff referred to the system's history of problems, there was no mention of ongoing software problems at this time.

On May 1, 1995, plaintiff filed a complaint specifically alleging that defendant breached its performance warranty, breached its warranty of merchantability, breached its warranty of fitness for a particular purpose, breached its warranty of fitness for ordinary purposes, made false statements to plaintiff in connection with its warranties and representations, and failed to supply plaintiff with personnel and services necessary for the proper operation of the goods at issue (Item 1, ¶¶ 7, 13, 17, 20, 23, 31). Plaintiff claims that as a result of each such breach or failure, it is entitled to reimbursement of the purchase price already paid, plus damages, for a total of $250,000.00 (Item 1, ¶¶ 8, 14, 18, 21,28, 33). The essence of plaintiffs claim is

Ex. 9). It is impossible to determine from either party's exhibits when the system components were actually shipped, received, and installed, or whether they were shipped in a single delivery.

3. In an internal memorandum dated August 31, 1993, plaintiff states that it experienced software problems immediately upon installation of the first phase of the' system in January 1993. However, there is no indication that plaintiff contacted defendant regarding these problems prior to April (Item 9, Ex. 9).

4. Though not explicitly stated, all of the problems experienced by plaintiff at that time appear to have been related to software.

5. Again, these problems appear to have been software-related.

6. There is no evidence of any further communication between the parties for almost one year thereafter.

that defendant failed to supply a fully operational system as warranted and failed thereafter to correct the deficiencies.

Defendant filed a counterclaim on June 16, 1995, alleging that plaintiff breached its contract with defendant when it failed to pay in accordance with the terms of the agreement (Item 2).[7] On August 15, 1996, defendant filed the pending motion, claiming that no genuine issue of fact exists with respect to plaintiffs claims (Item 7).

### DISCUSSION

### I. APPLICABLE SUBSTANTIVE LAW.

This court's jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332 (1993). It is well-established that a federal court sitting in diversity jurisdiction, while using its own rules governing procedural matters, will apply the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78–80, 58 S.Ct. 817, 822–23, 82 L.Ed. 1188 (1938); *Consorti v. Armstrong World Indus., Inc.*, 72 F.3d 1003 (2d Cir.1995), *vacated on other grounds,* —— U.S. ——, 116 S.Ct. 2576, 135 L.Ed.2d 1091 (1996). This includes the forum state's conflict of laws rules. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Bank of New York v. Amoco Oil Co.*, 35 F.3d 643, 650 (2d Cir.1994).

Defendant claims that Ohio substantive law governs in the present case. Plaintiffs action is based on its purchase of a computer system, consisting of hardware and software, from defendant.

[1] Under the law of New York, the transaction at issue constitutes a sale of goods, and is therefore governed by the Uniform Commercial Code. *See Triangle Underwriters, Inc. v. Honeywell, Inc.*, 457 F.Supp. 765, 769 (E.D.N.Y.1978) (computer software, though intangible, is more readily characterized as "goods" than "services"), *aff'd in part, rev'd in part and remanded on other grounds*, 604 F.2d 737 (2d Cir.1979); *Communications Groups, Inc. v. Warner Communications Inc.*, 138 Misc.2d 80, 527 N.Y.S.2d 341, 344 (N.Y.City Civ.Ct.1988) (computer software is a tangible and movable item qualifying as a "good" under Article 2 of the U.C.C.).

The New York Uniform Commercial Code allows parties to a sale agreement to stipulate which state's law will govern their rights and duties, provided that the transaction bears a "reasonable relation" to the state chosen. N.Y.U.C.C. § 1–105(1) (McKinney 1993). Defendant's "Standard Conditions of Sale–Warranty" provides that Ohio law applies to any agreement arising out of this transaction. Plaintiff does not dispute the validity or applicability of this term. As defendant is a citizen of the State of Ohio, this transaction is reasonably related to the state chosen.

Under Ohio law, the transaction at issue is a sale of goods. *Delorise Brown, M.D., Inc. v. Allio*, 86 Ohio App.3d 359, 620 N.E.2d 1020, 1021–22 (1993) (where hardware and software are provided in a single agreement, both are "goods" as defined in Article 2). Therefore, the agreement is governed by Article 2 of the Uniform Commercial Code as codified in Chapter 1302 of the Ohio Revised Code and as interpreted by Ohio state courts.

### II. SUMMARY JUDGMENT.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Allen v.*

---

**7.** Defendant claims damages in the amount of the balance owing on the original contract plus $1,900.65 owed on the purchase of additional equipment and $16,500 in time and material charges accrued for in-plant service and training.

*Coughlin,* 64 F.3d 77, 79 (2d Cir.1995). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, supra,* 477 U.S. at 248, 106 S.Ct. at 2510; *see Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. To avoid summary judgment, the nonmoving party must then come forward with enough evidence to support a jury verdict in its favor. The nonmoving party cannot prevail "merely by vaguely asserting the existence of some unspecified disputed material facts," *Borthwick v. First Georgetown Securities, Inc.,* 892 F.2d 178, 181 (2d Cir.1989), or on the basis of "mere speculation or conjecture." *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 12 (2d Cir. 1986) *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). When a dispute in fact is shown to exist, it must be material in light of the substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson, supra,* 477 U.S. at 248, 106 S.Ct. at 2510.

## A. *Breach of Express Performance Warranty.*

Plaintiff alleges that "the Defendant represented and warranted and agreed that the said equipment would perform properly and according to the specifications submitted" and that "the equipment and software has never properly complied" (Item 1, ¶¶ 6, 7). Plaintiff asserts that defendant's cover letter to its quotation dated June 10, 1992 warranted that the goods would "work without exception in the Plaintiffs factory" (Item 9, p. 7). Specifically, plaintiff refers to those portions of the letter quoted above regarding defendant's experience in the plastics industry, the CIM system's place on the leading edge of technology, and defendant's confidence regarding the system's potential to significantly improve plaintiffs profit (Item 9, p. 5).

Defendant argues that it provided plaintiff with a warranty against defects in equipment only, and that it made no performance warranty (Item 7, p. 11). In addition, defendant claims that all express warranties have expired, that plaintiff is seeking a remedy to which it is not entitled, and that, in any event, plaintiff voided the warranties contained in the agreement when it failed to pay pursuant to the terms specified therein (Item 7, pp. 14, 16).

## 1. Extent of Defendant's Warranty

It is undisputed that plaintiff accepted the terms of defendant's proposals when it issued purchase orders # 31713 and # 31713A (Item 3, ¶ 1). The parties' dispute centers primarily on whether the entire agreement is contained within the quotation and standard conditions, as defendant argues, or whether it also includes statements made in the cover letter, as plaintiff claims.

■ "Generally, a writing should be interpreted as a whole and *all the writings* that are part of the same transaction should be interpreted together." *Abram & Tracy, Inc. v. Smith,* 88 Ohio App.3d 253, 623 N.E.2d 704, 708 (1993) (citing Restatement of the Law 2d, Contracts (1981) 86, § 202(1) and (2); 2 Farnsworth, Contracts (1990) 255–56, § 7.10) [emphasis added]. Ohio courts have often considered language contained in a cover letter in, determining the validity or defining the terms of a disputed agreement. *See id.,* note 1 (court, in determining extent of defendant's contractual obligations, considered cover statements to be part of the contract); *In re Ohio Knife Corp.,* Nos. C–910482, C–910488, 1992 WL 308365, at *5 (Ohio App. Oct. 21, 1992) (finding that trial court's interpretation of ambiguous contract term was buttressed by language in cover letter sent with draft of the agreement); *Karkomi v. Americare Corp.,* No. 89AP–1116, 1990 WL 140682, at *3 (Ohio App. Sept. 25, 1990) (conditions in cover letter determinative in finding that no agreement had been reached as a matter of law).

■ Defendant argues that summary judgment is appropriate because plaintiff is alleging the existence of warranties not set

forth in their final written agreement. Defendant relies on the parol evidence rule applicable to U.C.C. sales contracts in concluding that plaintiffs claims are barred. The rule states that:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. . . .

Ohio Rev.Code Ann. § 1302.05 (Anderson 1993); U.C.C. 2–202.

Defendant's argument is unpersuasive. Plaintiff has identified specific language in defendant's cover letter of June 10, 1992 as the basis for its claim. The letter, written on the same date as defendant's quotation # 10781, is neither a "prior agreement" between the parties nor a "contemporaneous oral agreement." Therefore, the cover letter is not excluded under the parol evidence rule.

█ Plaintiff has succeeded in raising material issues as to whether the cover letter accompanying defendant's quotation is part of their final agreement and, if so, whether it contains any warranties or representations regarding the performance of the CIM system. In other words, does the letter contain affirmations of fact rather than mere puffery.

### 2. Expiration of Express Warranties

Defendant argues that it is entitled to summary judgment because its Standard Conditions disclaims any warranty other than those set forth in that document, and that all applicable warranties have expired. Specifically, defendant claims that the goods were shipped in October 1992 and that all applicable warranties expired within one year from that date. While there is ambiguity in the record as to whether the goods were actually sent in a single shipment or in installments, it does appear that all goods were shipped more than one year prior to the date on which plaintiff commenced this action.

In response, plaintiff refers to letters from defendant, written subsequent to the agreement, in which defendant promised to correct outstanding problems. These letters, dated September 27, 1993 (Item 9, Ex. 11), October 1, 1993 (*Id.*, Ex. 12), and October 5, 1993 (*Id.*, Ex. 13), indicate an intent to work with plaintiff toward resolution of its problems in October 1993 and until defendant could ensure that "all outstanding issues are corrected" (*Id.*).

█ Under Ohio law, the terms of a commercial sales contract can be modified by subsequent agreements. *Software Clearing House, Inc. v. Intrak, Inc.,* 66 Ohio App.3d 163, 583 N.E.2d 1056, 1061 (1990). This includes modification of express warranties. *Koukios v. Mktg. Dynamics, Inc.,* Nos. C–920913, C–920918, C–930555, 1994 WL 481769 (Hamilton App. Sept. 7, 1994). Such a warranty modification can be expressed in a letter. *Cincinnati Ins. Co. v. Quikrete Companies,* No. 96APE04–424, 1996 WL 532188 (Ohio App. Sept. 17, 1996). Thus, plaintiffs exhibits raise a material issue as to whether defendant's subsequent letters modified the warranties it provided in the agreement.

In addition, as stated above, plaintiff raises issues of fact as to whether the defendant's cover letter constitutes part of the agreement and whether the statements therein are sufficient to create an express warranty. Should such a warranty exist, there is no indication that it would have expired by October 1993.

Thus, questions of fact exist as to whether all warranties expired prior to commencement of this action.

### 3. Plaintiff's Remedy under Defendant's Warranty.

█ Defendant also claims that summary judgment should be granted because plaintiff is seeking money damages, a remedy that is unavailable under the agreement.

Plaintiff, for its part, alleges that defendant breached its agreement with plaintiff when it supplied goods that did not perform as warranted and then failed to repair the defects. Plaintiff asserts that it never accepted defendant's nonconforming goods, or alternatively, that it properly revoked its ac-

ceptance.[8] Under Ohio law, a purchaser who has not accepted goods or who has justifiably revoked acceptance is permitted to recover the contract price that has been paid and other money damages. Ohio Rev.Code Ann. § 1302.85; U.C.C. 2–711. In addition, section 1302.89 allows a buyer to recover incidental and consequential damages resulting from seller's breach. U.C.C. 2–715.

Defendant argues that those remedies are inapplicable here because the Uniform Commercial Code allows parties to contractually modify or limit remedies, and such limitations are clearly stated in the agreement at issue. Ohio Rev.Code Ann. § 1302.93; U.C.C. 2–719. In this case, the Standard Conditions expressly warrants discrete system components (Item 7, Ex. B). In each instance, defendant's liability is limited to repair or replacement of defective equipment. The document further states that:

LIMITATIONS

... THE LIABILITY OF HUNKAR LABORATORIES INC. WITH RESPECT TO ANY CONTRACT OR SALE, OR ANYTHING DONE IN CONNECTION THEREWITH, WHETHER IN CONTRACT, IN TORT, UNDER ANY WARRANTY OR OTHERWISE, SHALL BE LIMITED TO THAT EXPRESSLY PROVIDED ABOVE.

Plaintiff has not raised a question as to the conscionability of this limitation or any failure of its essential purpose. However, as noted in parts 1 and 2 above, plaintiff has succeeded in raising material issues regarding whether defendant's cover letter provides a performance warranty and whether defendant's subsequent letters modified the express warranties contained in the original agreement. None of the letters at issue contain terms limiting plaintiffs remedies to repair and replacement. Thus, a question of fact exists as to whether plaintiff can seek money damages for defendant's alleged breach.

## 4. Plaintiffs Alleged Breach of Contract.

Defendant claims that its warranties were voided when plaintiff failed to pay in accordance with the terms of the agreement. Under defendant's Standard Conditions, "[w]arranties contained herein are immediately void if the buyer fails to pay pursuant to the terms specified herein...." Defendant claims that the full payment was due upon delivery.

Plaintiff admits that it agreed to pay in accordance with defendant's terms and that it has not yet paid the entire purchase price. However, plaintiff alleges that defendant tendered nonconforming goods and that plaintiff rejected those goods.

Tender of delivery entitles the seller to payment according to the contract. Ohio Rev. Ann.Code § 1302.51; U.C.C. 2–507. The purchaser is obligated to pay at the contract price for any goods accepted. Ohio Rev.Code Ann. § 1302.65; U.C.C. 2–607(1). However, the buyer has a right to reject goods that do riot conform. Ohio Rev.Code Ann. § 1302.60; U.C.C. 2–601. Therefore, plaintiff will be found to have breached the contract's payment terms only if it failed to pay for accepted goods.

In order to prevail on its summary judgment motion, defendant must show that there is no question of fact as to whether plaintiff accepted the goods. Rejection must be made within a reasonable time after delivery, yet defendant fails to provide either a shipment or delivery date. The manner of rightful rejection varies based on whether the goods were delivered in a single shipment or in installments. Defendant's own submissions are ambiguous in this regard. Thus, defendant has failed to meet its initial burden of demonstrating the absence of a genuine issue of fact with respect to plaintiff's breach.

8. Defendant, on the other hand, claims that plaintiff accepted the goods no later than November 6, 1992, and never properly revoked acceptance (Item 7, p. 6). Neither party provides a specific date on which goods were shipped or received. There is ambiguity in the record as to whether the goods were delivered in a single shipment or in installments. There are no, specifics regarding when the goods were actually inspected and installed. In the absence of such information, this court cannot make determinations regarding the parties' performance under the agreement.

Accordingly, for the reasons stated above, summary judgment on the issue of breach of an express performance warranty must be denied.

## B. *Breach of Implied Warranties.*

In its complaint, plaintiff alleges that defendant's statements give rise to warranties of merchantability, fitness for a particular purpose, and fitness for ordinary purposes. Plaintiff claims that defendant breached each of these warranties.

Defendant argues that summary judgment should be granted on all claims involving implied warranties because the agreement conspicuously and expressly excludes them.

### 1. Merchantability and Fitness for a Particular Purpose.

Unless excluded or modified, a warranty that goods are merchantable is implied in every contract for their sale where the seller is a merchant dealing in goods of the kind sold. Ohio Rev.Code Ann. § 1302.27; U.C.C. 2–314; *Allis–Chalmers Credit Corp. v. Herbolt,* 17 Ohio App.3d 230, 479 N.E.2d 293, 297 (1984).

Similarly, where a seller at the time of contracting has reason to know any particular purpose for which the buyer requires the goods and that the buyer is relying on the seller's skill or judgment in selecting or furnishing the goods, there is an implied warranty of fitness for that purpose unless such warranty is excluded or modified. Ohio Rev. Code Ann. § 1302.28; U.C.C. 2–315; *Ressallat v. Burglar & Fire Alarms, Inc.,* 79 Ohio App.3d 43, 606 N.E.2d 1001, 1006 (1992).

A seller may modify or exclude implied warranties in the following manner:

> (B) Subject to division (C) of this section, to exclude or modify the implied warranty of merchantability or any part of it the language, must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states for example, that

"There are no warranties which extend beyond the description on the face hereof." Ohio Rev.Code Ann. § 1302.29; *see* U.C.C. 2–316.

Thus, to avoid summary judgment, plaintiff must show that a material issue of fact exists as to whether defendant's exclusions meet the statutory requirements. Plaintiff makes no argument to that effect, and upon reviewing the applicable case law, this court finds that no such insufficiency is evident in the record.

### 2. Fitness for Ordinary Purposes.

In its fourth cause of action, plaintiff claims that defendant breached an implied warranty of fitness for ordinary purposes. Under the Uniform Commercial Code, a claim that goods are unfit for ordinary purposes is, by definition, a merchantability claim. Ohio Rev.Code Ann. § 1302.27; U.C.C. 2–314. Plaintiff's claim for breach of the implied warranty of merchantability has already been addressed.

Accordingly, defendant's motion for summary judgment must be granted with respect to plaintiff's implied warranty claims.

## C. *Fraud.*

Plaintiff claims that defendant made certain false statements with the intent to induce plaintiff into purchasing a CIM system, and that plaintiff relied on those statements. The alleged false statements involved, among other things, the extent of defendant's experience in the plastics industry, the extent to which the CIM system had been applied in that field, and the technological sophistication of the goods. Specifically, plaintiff alleges that the system was, in fact, an unproven prototype, and that plaintiff was damaged when it relied on defendant's false statements and purchased a computer system that failed to operate properly.

A fraud claim such as this reflects the commercial reality that a corporation would not contract to spend over $100,000 for a computer system unless it believed that the system would adequately and efficiently meet its needs. In its letter dated June 10, 1992, defendant made statements regarding its

competence to recommend and supply an appropriate computer system for plastics manufacturing and regarding the proven nature of its systems. The letter also indicates that defendant's representatives met with plaintiff prior to providing a quotation and that the configuration ultimately proposed was based on those conversations.

While plaintiff's allegations are clearly insufficient to *prove* the falsity of the representations made, defendant's intent, or plaintiff's reliance, they are sufficient to state a claim.

Defendant, in response, has failed to meet its initial burden of demonstrating the absence of a genuine issue of material fact. The sole document presented by defendant on this issue is the affidavit of its president, who states that the alleged false statements are, in fact, true. This document alone is insufficient to meet defendant's burden.

Accordingly, summary judgment must be denied on the issue of fraud.

### D. *Failure to Provide Services.*

■■■ Plaintiff claims that defendant warranted and represented that it would regularly make support personnel available to plaintiff and that it has failed to do so. Specifically, plaintiff alleges that such services would include training, repair, instruction, in-plant services, training on hardware operation, "back up" installation, and reprogramming. Plaintiff's claim has been addressed above to the extent that it is based on defendant's alleged failure to honor express or implied repair warranties. With respect to plaintiff's remaining allegations, defendant points to the written agreement as evidence that the parties did not contract for ongoing technical support or maintenance services.

Defendant, in its quotations, offered to provide specific in-plant "check out" and training services at an additional charge following plaintiffs installation of the system. Training programs were offered on a cost per person basis. Installation and reprogramming were explicitly stated to be the responsibility of the user. Defendant argues that use of these services was at the plaintiff's discretion, and that there is nothing in the agreement requiring defendant to offer the services indefinitely.

Plaintiff does not dispute this assertion, and in fact, makes no reply in support of its claim. Plaintiff does not allege that defendant failed to provide the initial checkout and training services it offered. In addition, plaintiffs exhibits show that its employees attended training programs offered by defendant and that it continued to use defendant's repair and technical support services at least until February 1995, when it expressed dissatisfaction with the quality and timeliness of those services.

The availability of support services at plaintiffs request and at an additional charge did not create a contractual obligation to service plaintiff's computer system. *See Abram & Tracy, Inc., supra,* 88 Ohio App.3d 253, 623 N.E.2d 704, 708–709. Plaintiffs vague assertion that defendant warranted "services would be regularly made available," in the absence of any supporting evidence, is insufficient to defeat a motion for summary judgment.

To the extent that plaintiffs allegations may rely on oral representations made by defendant, its claim is barred by the parol evidence rule. Ohio Rev.Code Ann. § 1302.05; U.C.C. 2–202.

Accordingly, summary judgment must be granted with respect to this claim.

### CONCLUSION

For the reasons set forth herein, defendant's motion for summary judgment (Item 7) is GRANTED on the issues of breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of fitness for ordinary purposes, and failure to provide services, and DENIED on the issues of breach of express warranty and fraud.

**SO ORDERED.**